NOT FOR PUBLICATION                                        (Doc. Nos. 14, 18)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

—————————————————————
                                                        :
WILEY MISSION, a religious corporation,    :
                                                        :
                Plaintiff,                              :
                                                        :        Civil No. 10-3024 (RBK/JS)
        v.                                              :
                                                        :            **OPINION**
STATE OF NEW JERSEY,                          :
DEPARTMENT OF COMMUNITY                :
AFFAIRS                                             :
                                                        :
                Defendants.                         :
—————————————————————       :

**KUGLER**, United States District Judge:

        This case involves a conflict between a church's internal organizational structure and a

neutral and generally applicable state law.  Plaintiff Wiley Mission, Inc. (the "Church") operates

a continuing care retirement center ("CCRC").  Because the CCRC is a ministry of the Church, it

is not separately incorporated and the Church's spiritual leaders are the CCRC's governing body.

The State of New Jersey regulates CCRCs in order to protect senior citizens.  Pursuant to N.J.

Stat. Ann. § 52:27D-345(e), every CCRC must include a CCRC resident as a full voting member

of the CCRC's governing body.  The statute effectively requires the Church to include a non-

Church member in its governing body or lose its license to operate the CCRC.

        The Church challenges N.J. Stat. Ann. § 52:27D-345(e) as violating its First-Amendment

and Equal-Protection rights as well as analogous provisions in the New Jersey Constitution.  The

Church seeks a declaratory judgment that N.J. Stat. Ann. § 52:27D-345(e) is unconstitutional as

applied to it and an injunction preventing the Department of Community Affairs (the

"Department") from enforcing the provision against the Church.  Both parties now move for summary judgment (Doc. Nos. 14, 18).  As explained below, the Church's free-exercise and equal-protection claims fail because N.J. Stat. Ann. § 52:27D-345(e) is neutral, generally applicable, and rationally related to a legitimate government purpose.  However, strict scrutiny applies regarding the Church's freedom-of-association claim because the Church is an "expressive association."  Because the Department presents no evidence that N.J. Stat. Ann. § 52:27D-345(e) is narrowly tailored to protect senior citizens, the Court grants the Church summary judgment regarding its freedom-of-association claim, and permanently enjoins the State of New Jersey, its subdivisions, agents, servants and employees from enforcing N.J. Stat. Ann. § 52:27D-345(e) against the Church.

## I.   BACKGROUND[1]

### A.  The Wiley Mission

The Church is a non-denominational religious corporation chartered pursuant to N.J. Stat. Ann. § 16:1-1.  The Church has tax exempt status under § 501(c)(3) of the Internal Revenue Code.[2]  "The goal of the Church is to carry out the Great Commission as given by Jesus Christ in Matthew 28:18-20" and "reveal[] Christ as the Answer to life."  (Gilmore Aff. ¶¶ 4, 12).  To that end, the Church engages in "worship, evangelization, religious education, and social ministries." (Gilmore Aff. ¶ 12).

---

[1] The parties agree that there are no material facts in dispute.

[2] The Church is also exempt from New Jersey's Unemployment Compensation law because it is "operated primarily for religious purposes."  (Aff. of Gary F. Gilmore ("Gilmore Aff.") Ex. 2).  Additionally, "[t]he entirety of the [Church's] facilities, including the CCRC, is a class 15D" property that is fully exempt from property taxes pursuant to N.J. Stat Ann. § 54:4-3.6.  (Supp. Aff. of Gary F. Gilmore, ¶ 13).

In the early 1940s, to further its goals of realizing the "Great Commission" and "revealing Christ," the Church began to minister to the elderly.[3]  (Id. ¶ 12).  The Church eventually established a permanent CCRC in Marlton, New Jersey.  (Id. ¶ 13).  The CCRC "serves the physical and spiritual needs of aged and/or infirm persons."  (Id. ¶ 12).  The CCRC is "part of a 'life-cycle' ministry" that "strives to serve all ages and all areas of life, the spiritual as well as the physical."  (Id.).  It is a "core ministry" of the Church.  (Id. ¶ 13).

 The CCRC is not separately incorporated.  It operates as part of the Church.  The Church is governed by a Board of Trustees.  Pursuant to the Church's Bylaws, the "Board of Trustees shall have entire charge and control of the Wiley Christian Retirement Community."  (Compl. Ex. B, at 4).  Thus, the Board governs the Church, the CCRC, and all other Church ministries.

The Board consists of at least seven but not more than eleven members who are elected for three-year staggered terms.  The Bylaws provide that the "Trustees are the spiritual Elders of the Church."  (Id.).  The Bylaws impose the following qualifications for Trustees:

> Each Trustee shall be a Believer in Jesus Christ and shall have been a member in good standing of [the Church] for a minimum of five (5) continuous years.  In addition, the [Church] will be mindful of definite and specific Biblical standards when considering the qualifications of any person or persons to serve on the Board of Trustees.  Turning to the Word of God, the admonitions of  1 Tim. 3:1-7 and Titus 1:5-9 shall be the guiding principles of this body.  In furtherance of those principles, the following guidelines must be followed in choosing a member to serve on the Board of Trustees:
>
> 1. The candidate must be of good report, grave, sober, vigilant, of good behavior and not given to wine, strong drink or tobacco.

---

[3] The Church also operates other social ministries, including an adult daycare facility, a behavioral daycare program, a pre-school, and an addiction counseling program.  (See Gilmore Aff. ¶ 8, Ex. 4, at WM0090).

2. The candidate should be able to testify without qualification
to a definite new birth and willing to live a Holy Life, "Be
ye Holy as I am Holy.

(Id. at 5). The Bylaws require that Board members retire at the age of 75. The Board of Trustees

makes decisions by a majority vote of a quorum of its members. A quorum is six members, or, if

the Board consists of less than eleven members, a quorum is one-half of the full membership of

the Board. The Board is "responsible for guiding the Church according to God's will."

(Gilmore Aff. ¶ 10).

The Church is significantly involved in the CCRC's management, operation, and

programming. Regarding management, Gary F. Gilmore is the CCRC's President and Chief

Executive Officer. Mr. Gilmore is a spiritual "elder" of the Church and a member of the Board.

Victor A. Flamini is the CCRC's Chief Financial Officer. Mr. Flamini is also a spiritual "elder"

of the Church and a member of the Board. Regarding operation, the Church runs the CCRC as a

"Christian Retirement Community." (Gilmore Aff. Ex. 5, at WILEY007). One of the CCRC's

brochures reads: "Since 1938 we have been providing for the physical and spiritual needs of our

retired residents. Our purpose is, and has always been, to reveal Jesus Christ as the answer to

life, now and forever." (Id.). Regarding programming, the Church is located on the CCRC

premises and members of the church appear to be significantly involved in the CCRC's

activities. For example, the Church operates what it calls the "Stephen Ministry," which trains

"lay persons [to] provide one-to-one 'distinctively' Christian care to individuals facing life

challenges." (Gilmore Aff. Ex. 4, at WM0086-87) (emphasis in original). The Church trained

several of its members to work with CCRC residents. (Id.).

4

The CCRC is open to all who wish to become residents without regard to religious beliefs.  Residents are not required to be members of the Church.[4]  Residents are required to sign a contract with the Church and pay for certain services.[5]  Currently, the CCRC consists of 137 independent-living residential units, 53 residential healthcare beds, and 67 skilled nursing beds. The Department does not argue that the Church fails to operate the CCRC in a satisfactory or safe manner.  In fact, the evidence shows that CCRC residents and their families are exceptionally satisfied with and appreciative of the high quality of care that the Church provides through the CCRC.  (See Gilmore Aff. Ex. 4, at WM0091-96) (providing results from the CCRC's 2009 "resident/family satisfaction survey.").

### B.  The Statutory Provision at Issue as Applied to the Church

Pursuant to the Continuing Care Retirement Community Regulation and Financial Disclosure Act, N.J. Stat. Ann § 52:27D-330 et seq. (the "Act"), the Department regulates all CCRCs within the State.  In order to ensure compliance with state rules and regulations, all CCRCs must obtain and maintain a valid Certificate of Authority ("COA") from the Department. N.J. Stat. Ann. § 52:27D-333(a).  In order to maintain a valid COA, a CCRC must file an annual disclosure statement that demonstrates compliance with applicable rules.  In 2007, in response to lobbying efforts by the Resident Associations of New Jersey, the New Jersey State Legislature amended the Act to require:

> The board of directors or other governing body of a facility shall include at least one resident as a full voting member of the board or body.  Resident members shall be nominated by the elected representatives of the residents and selected by the board of directors or other governing body.

---

[4] Fourteen of the current residents are members of the Church.

[5] Residents pay a $1,000 deposit, an entrance fee, and a monthly maintenance fee.  (See Gilmore Aff. Ex. 5).

N.J. Stat. Ann. § 52:27D-345(e).  The amendment took effect beginning with the 2009 annual disclosure statements.[6]  (Cert. of Ronald F. Cavanaugh, ¶ 6).  Beginning in 2009, the Department required all CCRCs to identify in their annual disclosure statement the resident representative who satisfies N.J. Stat. Ann. § 52:27D-345(e).  (Id.).

The Church's CCRC was first certified by the Department in 1990.  The Church submitted annual disclosure statements every year thereafter, and the Department issued the Church a COA each year without incident until 2009.  (Id. ¶ 5).

There is a dispute regarding the Church's 2009 and 2010 disclosure statements.  According to Ronald F. Cavanaugh, who works for the Department and is responsible for reviewing CCRC disclosure statements, the Church "listed the Reverend Cecil P. Gilmore, Jr., as the current resident trustee on the Board of Trustees of the CCRC on its annual recertification applications submitted to the Department for 2009 and 2010."[7]  (Cavanaugh Cert. ¶ 10).  Thus, Mr. Cavanaugh claims that "[i]t was not until the filing of this lawsuit that the Department began to suspect that Wiley Mission may not be in full compliance with the requirements of the Act."  (Id. ¶ 11).

The Church disputes Mr. Cavanaugh's claims.  According to Mr. Gilmore, the Church CEO, the Church did not identify a resident representative on its 2009 disclosure statement.  (Supp. Gilmore Aff. ¶ 4, Ex. A).  The Church submits an affidavit from Mr. Gilmore authenticating its 2009 disclosure statement, which does not identify a resident representative.

---

[6] The 2007 amendments to the Act also include other provisions that require the Board to give notice to residents regarding regular meetings and provide residents with a meaningful opportunity to respond to proposals by the Board.  See P.L. 1986, c. 103, sec. 16.  The Church does not challenge those requirements and there is no evidence that the Church does not comply with them.

[7] Curiously, Exhibit D to Mr. Cavanaugh's certification includes two disclosure statements.  One of the disclosure statements does not identify a resident representative.  The second disclosure statement contains the annotation "sent 9-1-10" and identifies "Rev. Cecil P. Gilmore Jr." as the residential representative.  (Cavanaugh Cert., Ex. D).  Thus, Mr. Cavanaugh does not attach any documentation corroborating his assertion regarding the 2009 disclosure.

(Id. ¶ 4).  Mr. Gilmore states that after he filed the 2009 disclosure statement in June 2009, "Mr.

Cavanaugh contacted me in late July or early August of 2009 and informed me that I <u>had</u> to

name a 'resident trustee' in accordance with the new law or Wiley would be 'shut down' for

non-compliance."  (Id. ¶ 5) (emphasis in original).  Mr. Gilmore further states that during a

subsequent conversation with Mr. Cavanaugh, he "specifically indicated to Mr. Cavanaugh that

there was no Board member elected by the resident[s] and that while the Reverend Cecil P.

Gilmore, Jr., a member of the Board of Trustees, did reside in the CCRC, he was not elected by

the residents, and he did not have a life care contract."[8]  (Id. ¶ 6).  Mr. Gilmore claims that Mr.

Cavanaugh told him in response that "he would reflect Rev. Gilmore as the resident trustee on

Wiley's annual registration statement for 'this year' but . . . that Wiley had to add an elected

resident Board member going forward."  (Id. ¶ 7).  The Department subsequently issued the

Church a COA for 2009.

Mr. Gilmore states that he "did not fill in the blank requesting the name of the resident

Board member" when completing the Church's 2010 disclosure statement.  (Id. ¶ 8).  In response

to the Church's 2010 disclosure statement, Mr. Cavanaugh sent Mr. Gilmore two letters dated

August 19, 2010.  (Id. ¶ 8, Ex.'s B-1, B-2).  The first letter identifies three unrelated deficiencies

in the Church's disclosure statement.  The second letter states:

> Our records indicate that the current resident trustee for Wiley
> Christian Retirement Community is Cecil P. Gilmore, Jr.  Unless
> the Department receives written confirmation to the contrary,
> within the next 10 business days, we will assume that there has
> been no change and Mr. Gilmore will continue to act as the
> resident trustee.

---

[8] The Church submits an affidavit from Victoria A. Flamini stating that she was present when Mr. Gilmore so informed Mr. Cavanaugh.  (Aff. of Victoria A. Flamini ¶¶ 3-4).

(Id. Ex. B-2).  According to Mr. Gilmore, "[s]ince there was no change from what I had indicated to Mr. Cavanaugh the previous time, I personally wrote in Rev. Gilmore's name as the resident trustee, as instructed and returned the form on September 1, 2010 by fax."  (Id. ¶ 9).

### C.  The Complaint and Summary Judgment Motions

The Church filed the Complaint on June 14, 2010.  The Church seeks "declaratory and injunctive relief from" N.J. Stat. Ann. § 52:27D-345(e).  (Compl. ¶ 1).  The Church asserts claims under 42 U.S.C. § 1983 for violations of its First Amendment rights to freedom of religion and freedom of association as well as violations of the Fourteenth Amendment's Equal Protection Clause.  The Church asserts claims under the New Jersey Constitution for violation of it free-exercise and associational rights.

In January 2011, the Church moved for summary judgment, seeking a permanent injunction prohibiting the Department from enforcing N.J. Stat. Ann. § 52:27D-345(e) against the Church.  The Church argues that N.J. Stat. Ann. § 52:27D-345(e) is unconstitutional because it directly interferes with the Church's governance, which the First Amendment protects from state interference.  The Department opposes the Church's motion and cross-moves for summary judgment.  The Department argues that the Church's claims are not ripe.  The Department also argues that the Church's First Amendment claims fail on the merits because N.J. Stat. Ann. § 52:27D-345(e) is a neutral law that is generally applicable and there is no evidence that the New Jersey State Legislature adopted the law for the purpose of interfering with church governance.  According to the Department, because N.J. Stat. Ann. § 52:27D-345(e) is neutral and generally applicable, the Court must apply the rational basis standard of review.  Under that standard, the Court must uphold the law, according to the Department, because it is rationally related to the legitimate government goal of protecting the elderly and disabled from exploitation and abuse by

CCRCs.  The Department argues that rational basis review also applies to the Church's freedom-of-association and equal-protection claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, the Court is not to make credibility determinations regarding witness testimony.  Sunoco, Inc. v. MX Wholesale Fuel Corp., 565 F. Supp. 2d 572, 575 (D.N.J. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

However, to defeat a motion for summary judgment, the nonmoving party must present competent evidence that would be admissible at trial.  See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995).  The nonmoving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions [or] conclusory allegations or suspicions" to establish the existence of a genuine issue of material fact.  Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (citation omitted); see Fed. R. Civ. P. 56(e).  "A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' mandates the entry of summary judgment."  Watson v. Eastman Kodak Co., 235 F.3d 851, 857-58 (3d Cir. 2000) (quoting Celotex Corp., 477 U.S. at 322).

## III.    DISCUSSION

### A.  Ripeness

The Department's ripeness argument is poorly framed.  The Department argues that the Court should dismiss the Complaint because the dispute was not ripe "at the time the Complaint was filed" because, at that time, the Department believed that the Church was in full compliance with N.J. Stat. Ann. § 52:27D-345(e).  (Defs.' Br. at 8-10).  The Department asserts that it was not until the Church initiated this litigation that it learned that the Church may be in violation of N.J. Stat. Ann. § 52:27D-345(e).  Thus, the Department concludes that the dispute is not ripe because "the Department has not been afforded the opportunity to review this matter, and conduct an investigation into this matter."  (Defs.' Br. at 10).  Stated more succinctly, the Department argues that the Church's claims are not ripe because the Department has not actually revoked the Church's COA for violating N.J. Stat. Ann. § 52:27D-345(e).[9]

The Department's argument is misguided.  "The Declaratory Judgment Act permits a federal court the discretion to 'declare the rights and other legal relations of any interested party seeking such declaration,' when there is a 'case of actual controversy.'"  Abraham v. Del. Dep't of Corr., 331 F. App'x. 929, 931 (3d Cir. 2009) (quoting 28 U.S.C. § 2201).  The Supreme Court has established a two-part test for determining whether a claim is ripe for adjudication:  (1) courts must "evaluate both the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration."  Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).  "The Third Circuit has further refined that test in the declaratory judgment context."

---

[9] The Department also seems to argue that the dispute is not "ripe" because the Church failed to exhaust administrative remedies.  (See Defs.' Br. at 10) ("Should the department take action by issuing any notices of violation and monetary penalties against plaintiff for any suspected infraction, the Department's regulatory action is properly challengeable in a state administrative forum.").  That argument is misplaced.  "[T]here is no general requirement that plaintiffs exhaust state administrative remedies before bringing a § 1983 action."  James v. Richman, 547 F.3d 214, 217 (3d Cir. 2008) (citing Patsy v. Bd. of Regents, 457 U.S. 496, 516 (1982); Monroe v. Pape, 365 U.S. 167, 183 (1961)).  To the degree the Department's ripeness argument incorporates an exhaustion argument, it fails.

10

Tait v. City of Philadelphia, 639 F. Supp. 2d 582, 589 (E.D. Pa. 2009).  Courts must examine:
(1) "the adversity of the interests of the parties;" (2) "the conclusiveness of the judicial
judgment;" and (3) "the practical help, or utility, of that judgment."[10]  Step-Saver Data Sys., Inc.
v. Wyse Tech., 912 F.2d 643, 647 (3d Cir. 1990).

Regarding the first factor in the Step-Saver analysis, the "[p]arties' interests are adverse
where harm will result if the declaratory judgment is not entered."  Travelers Ins. Co. v. Obusek,
72 F.3d 1148, 1154 (3d Cir. 1995).  "Although the action cannot be based on a contingency, the
party seeking declaratory relief need not wait until the harm has actually occurred to bring the
action.  Thus, in an appropriate circumstance, a litigant can seek a declaratory judgment where
the harm is threatened in the future."  Travelers Ins., 72 F.3d at 1154 (internal citations omitted).
"Yet the threatened harm cannot be 'imaginary or speculative.'"  Tait, 639 F. Supp. 2d at 589
(quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)).  "In order to present a justiciable
controversy in an action seeking a declaratory judgment to protect against a feared future event,
the plaintiff must demonstrate that the probability of that future event occurring is real and
substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory
judgment."  Salvation Army v. Dep't of Cmty. Affairs, 919 F.2d 183, 192 (3d Cir. 1990)
(internal quotation marks omitted).  "Even when the challenge to the statute is on First
Amendment grounds, there must be a real and immediate threat of enforcement against the
plaintiff."  Tait, 639 F. Supp. 2d at 589 (internal quotation marks and citations omitted).

One key factor in assessing the reality and immediacy of the threat is whether the state
has expressly disavowed . . . enforcement of the challenged statute."  Id. at 591 (citing Virginia
v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 393 (1988)).  If the state disavows enforcement of

---

[10] The Supreme Court's holding in Abbott did not abrogate the Third Circuit's holding in Step-Saver.  See NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 342 n.9 (3d Cir. 2001) ("the Step-Saver rubric is a distillation of the factors most relevant to the Abbott Labs considerations.").

the statute, the dispute may not be ripe for adjudication.  Id. ("The threat of enforcement must remain real and immediate throughout the course of the litigation. . . .  Intervening events may render the controversy speculative and the dispute unripe.") (internal quotation marks and citations omitted).

Applying the Step-Saver analysis here, this case is ripe for adjudication.  The Act clearly provides that a CCRC must comply with N.J. Stat. Ann. § 52:27D-345(e) in order to maintain a valid COA.  A CCRC may not operate without a COA.  The Department concedes (and in fact argues) that the Church is currently in violation of N.J. Stat. Ann. § 52:27D-345(e).  Thus, the Department could enforce N.J. Stat. Ann. § 52:27D-345(e) at any time and revoke the Church's COA.  Indeed, the Department has not disavowed enforcement of N.J. Stat. Ann. § 52:27D-345(e), and, according to Mr. Gilmore, the Department has threatened to revoke the Church's COA if it does not comply with the statute.   Thus, there is a real and immediate threat that the Department will enforce the provision against the Church.

Regarding the utility of a ruling by this Court, the Department argues that the Church is not exempt from N.J. Stat. Ann. § 52:27D-345(e) and that the provision is valid and enforceable against the Church.  The Church responds that it is exempt from N.J. Stat. Ann. § 52:27D-345(e) because the provision unconstitutionally interferes with its First Amendment and Equal Protection rights.  The Church seeks a declaratory judgment that it is exempt from N.J. Stat. Ann. § 52:27D-345(e) and an order permanently enjoining the Department from enforcing the provision against the Church.  Clearly, such relief would resolve the parties' dispute regarding N.J. Stat. Ann. § 52:27D-345(e).  Thus, this matter is ripe for adjudication.  There is a concrete dispute between the parties, the reality of future harm to the Church is real and immediate, and a ruling by this Court would effectively resolve the dispute.

### B.  The Church's First-Amendment Free-Exercise Claim (Count I)

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting establishing of religion or prohibiting the free exercise thereof."  U.S. Const. amend. I.  The Supreme Court has applied the First Amendment to the States through the Fourteenth Amendment.  See Cantwell v. Connecticut, 310 U.S. 296, 303-05 (1940).

The Church alleges that N.J. Stat. Ann. § 52:27D-345(e) violates its right to the free exercise of religion (Count I).  The Department responds that N.J. Stat. Ann. § 52:27D-345(e) does not violate the Church's free-exercise rights because it is neutral and generally applicable. To decide this issue, the Court must first determine the appropriate constitutional standard of review and then apply that standard to N.J. Stat. Ann. § 52:27D-345(e).

### 1.  The Appropriate Constitutional Standard of Review

When a party challenges a law because it interferes with a religious practice, the Supreme Court's First Amendment jurisprudence has two divergent branches.  See Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 531-32 (1993).  First, the First Amendment "obviously" prohibits direct "governmental regulation of religious beliefs as such."  Employment Div. v. Smith, 494 U.S. 872, 878 (1990) (quoting Sherbert v. Verner, 374 U.S. 398, 403 (1963)). The government may not "compel affirmation of religious beliefs, punish the expression of religious doctrine it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma."  Id. at 877 (internal citations omitted).  Thus, the First Amendment protects churches' "power to decide for themselves, free from state interference, matters of church government."  Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 116 (1952).  The state may not directly regulate the "internal organization" of religious organizations.

Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713 (1976).  Such laws are

unconstitutional unless they are "narrowly tailored" to "advance" a "compelling governmental

interest."  Church of Lukumi Babalu Aye, 508 U.S. at 531-32.

     Second, "a law that is neutral and of general applicability need not be justified by a

compelling governmental interest even if the law has the incidental effect of burdening a

particular religious practice."  Id. at 531 (citing Smith, 494 U.S. 872).  Such laws are

constitutional if they satisfy the Fourteenth Amendment's universal requirement that laws be

rationally related to a legitimate governmental purpose.  See Smith, 494 U.S. at 876-81

(upholding neutral and general law that criminalized ingestion of peyote even though the law

interfered with ceremonial religious use of peyote); Tenafly Eruv Ass'n v. Borough of Tenafly,

309 F.3d 144, 165 (3d Cir. 2002) ("If a law is 'neutral' and 'generally applicable,' and burdens

religious conduct only incidentally, the Free Exercise Clause offers no protection").

     In determining whether a law is "neutral and of general applicability," the Supreme Court

has held that "a law is not neutral" if "the object of [the] law is to infringe upon or restrict

practices because of their religious motivation."  Church of Lukumi Babalu Aye, 508 U.S. at

533.  The Supreme further explained in Church of Lukumi Babalu Aye:

> There are, of course, many ways of demonstrating that the object
> or purpose of a law is the suppression of religion or religious
> conduct. To determine the object of a law, we must begin with its
> text, for the minimum requirement of neutrality is that a law not
> discriminate on its face. A law lacks facial neutrality if it refers to a
> religious practice without a secular meaning discernible from the
> language or context. . . .
>
> Facial neutrality is not determinative.  The Free Exercise Clause,
> like the Establishment Clause, extends beyond facial
> discrimination.  The Clause forbids subtle departures from
> neutrality, and covert suppression of particular religious beliefs.
> Official action that targets religious conduct for distinctive
> treatment cannot be shielded by mere compliance with the

> requirement of facial neutrality.  The Free Exercise Clause protects
> against governmental hostility which is masked as well as overt.
> The Court must survey meticulously the circumstances of
> governmental categories to eliminate, as it were, religious
> gerrymanders.

Id. at 534 (internal quotation marks and citations omitted) (holding that a municipal ordinance

was unconstitutional even though it was facially neutral because "the object" of the ordinance

was "suppression" of religion).

Even if a law is neutral and generally applicable, the Supreme Court has suggested that

strict scrutiny may apply if the plaintiff asserts a "hybrid" claim.  See Smith, 494 U.S. at 881.  In

Smith, the Supreme Court considered the appropriate standard of review to apply to an Oregon

law that prohibited the ingestion of peyote.  Id. at 879-81.  The plaintiffs were Native Americans

whose religious practices included the ceremonial ingestion of peyote.  Id. at 874-75.  They

challenged the law as violating their rights under the Free Exercise Clause and argued that strict

scrutiny should apply even though the law was religiously neutral and generally applicable.  Id.

at 879-81.  The Court rejected that argument.  The Court reasoned that "[t]he only decisions in

which we have held that the First Amendment bars application of a neutral, generally applicable

law to religiously motivated action have involved not the Free Exercise Clause alone, but the

Free Exercise Clause in conjunction with other constitutional protections, such as freedom of

speech and of the press, or the right of parents . . . to direct the education of their children."  Id.

at 881.  The Court found that because "the present case does not present such a hybrid situation,

but [rather] a free exercise claim unconnected with any communicative activity or parental

right," strict scrutiny did not apply.  Id.

Here, the Church does not argue that N.J. Stat. Ann. § 52:27D-345(e) regulates "religious

beliefs as such."  Sherbert, 374 U.S. at 403.  Rather, the Church argues that N.J. Stat. Ann. §

15

52:27D-345(e) incidentally burdens its religious practices.  There is no dispute that the First

Amendment protects the Church's right to determine its own internal self-governance.  Nor is

there any dispute that N.J. Stat. Ann. § 52:27D-345(e) is a neutral law of general applicability.

Nevertheless, the Church argues that strict scrutiny applies because the law implicates the "Free

Exercise Clause in conjunction with other constitutional protections."  (Pl.'s Reply Br. at 7)

(quoting Church of Lukumi Babalu Aye, 508 U.S. at 881).  According to the Church, N.J. Stat.

Ann. § 52:27D-345(e) implicates the "freedom of religious exercise, free expression of speech,

freedom of association, and equal protection under the law."  (Pl.'s Reply Br. at 7).

The Church's reliance on the hybrid-rights theory is misplaced.  Although "some litigants

pressing Free Exercise claims have presented a 'hybrid rights' theory, contending that even a

neutral, generally applicable regulation is subject to strict scrutiny if it 'incidentally burdens

rights protected by the Free Exercise Clause in conjunction with other constitutional

protections,'" Brown v. City of Pittsburgh, 586 F.3d 263, 284 (3d Cir. 2009) (quoting Tenafly

Eruv Ass'n v. Tenafly, 309 F.3d 144, 165 n.26 (3d Cir. 2002)), the Third Circuit has not

endorsed the hybrid-rights theory, id. ("Like many of our sister courts of appeals, we have not

endorse[d] this theory."); see Combs v. Homer-Center Sch. Dist., 540 F.3d 231, 233 (3d Cir.

2008).

In Combs, a group of parents challenged a Pennsylvania law regulating the home-

schooling of children.  Combs, 540 F.3d at 233.  The parents claimed that the regulations

infringed both their free-exercise rights as well as their Fourteenth Amendment right to control

the upbringing of their children.  Id. at 234.  The parents argued that strict scrutiny applied based

on the hybrid-rights theory mentioned in Smith.  Id. at 243-44.  The Third Circuit conducted an

16

extensive review of the various positions taken by other Courts of Appeals regarding the hybrid-rights theory,[11] as well as the Supreme Court's post-<u>Smith</u> decisions, and concluded:

> Since <u>Smith</u>, a majority of the [Supreme] Court has not confirmed the viability of the hybrid-rights theory. Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta.

<u>Id.</u> at 243-47. Thus, following <u>Combs</u>, the Third Circuit has universally declined to apply strict scrutiny to neutral and generally applicable laws that interfere with a plaintiff's exercise of religion. <u>See</u> <u>McTernan v. City of York</u>, 564 F.3d 636, 647 n.5 (3d Cir. 2009) ("We have neither applied nor expressly endorsed a hybrid rights theory, and will not do so today"); <u>Brown</u>, 586 F.3d at 284 ("Like many of our sister courts of appeals, we have not endorse[d] this theory."). In light of this Third Circuit precedent, and because the Church provides no other basis for applying strict scrutiny, the Court will apply rational basis review to the analysis of the Church's free-exercise claim.

**2. Rational Basis Review Applied to the Analysis of the Church's Free-Exercise Claim**

N.J. Stat. Ann. § 52:27D-345(e) survives rational basis review. The stated purpose of the Act is to protect the rights and well-being of senior citizens who increasingly rely on continuing care facilities. <u>See</u> N.J. Stat. Ann. § 52:27D-330 (declaration of legislative intent). Resident membership on the governing body is a rational means of protecting residents because it ensures that residents will have access to the institution making decisions, which, in turn, will provide residents with a meaningful opportunity to oppose or expose decisions that might adversely

---

[11] The Courts of Appeals are divided regarding the existence and meaning of the hybrid-rights theory. <u>See</u> <u>Combs</u>, 540 F.3d at 244. "The Second and Sixth Circuits seem to disregard the hybrid rights doctrine. The First and D.C. Circuits recognize hybrid claims only if both are independently viable, while the Ninth and Tenth Circuits will recognize hybrid claims if both component claims are colorable." Kristi L. Bowman, <u>Public School Students' Religious Speech and Viewpoint Discrimination</u>, 110 W. Va. L. Rev. 187, 222 n.26 (2007).

affect residents.  Additionally, because the resident member must have full voting rights, the statute provides residents with a way to participate in decisions related to their own well being.  In other words, N.J. Stat. Ann. § 52:27D-345(e) protects seniors because it facilitates accountability between the CCRC's governing body and its residents.  Thus, the Court grants summary judgment denying the Church's free-exercise claim (Count I).

### C.  The Church's Freedom-of-Association Claim (Count III)

The Church alleges that N.J. Stat. Ann. § 52:27D-345(e) violates its right to freely associate because it impermissibly requires the Church to include a non-member on its Board of Trustees (Count III).  The Department responds that the CCRC is a commercial enterprise, and, therefore, First-Amendment associational rights do not apply.[12]

 "[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  Roberts, 468 U.S. at 617-618; see also NAACP v. Ala. ex rel. Patterson, 357 U.S. 449 (1958).  That associational right derives from an underlying individual right to engage in a constitutionally protected activity.  Roberts, 468 U.S. at 617-618 ("The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties."); Salvation Army, 919 F.2d at 199 ("there is no constitutional right to associate for a purpose that is not protected by the First Amendment").

---

[12] The Supreme Court has distinguished between two types of associational rights:  (1) the right to intimate association; and (2) the right to expressive association.  See Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984).  The Church does not clearly explain which associational right it asserts.  However, in the Church's briefs, the Church cites cases discussing First Amendment associational rights.  Thus, the Court construes the Church's associational claim as predicated on the First Amendment.

Additionally, the right to intimate association emanates from general constitutional principles of individual liberty and applies only to "'certain kinds of highly personal relationships' such as marriage and family relationships, which are essential to 'the ability independently to define one's identity that is central to any concept of liberty.'"  Salvation Army, 919 F.2d at 198 (quoting Roberts, 468 U.S. at 617-18).  Neither the Supreme Court nor the Third Circuit has held that the "relationship between persons who choose to associate for religious purposes" is an intimate association entitled to constitutional protection.  Id. at 198.  Thus, even if the Church asserts an intimate association claim, that claim would not apply here.

The Supreme Court has held that the Free Speech Clause gives rise to an attendant right to associate for the purpose of engaging in collective expression.  See Boy Scouts of Am. v. Dale, 530 U.S. 640, 661 (2000).  Similarly, the Third Circuit has held that the Free-Exercise Clause gives rise to an attendant "right to associate for religious purposes."  See Salvation Army, 919 F.2d at 199.

"Government actions that may unconstitutionally burden [the freedom to associate] may take many forms, one of which is 'intrusion into the internal structure or affairs of an association' like a 'regulation that forces the group to accept members it does not desire.'"  Dale, 530 U.S. at 648 (quoting Roberts, 468 U.S. at 623).  "Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express.  Thus, '[f ]reedom of association . . . plainly presupposes a freedom not to associate.'"  Id. (quoting Roberts, 468 U.S. at 623).

There is a two-step process for determining whether a challenged law violates an associational right protected by the First Amendment because it requires the inclusion of an unwanted person in a group.  First, the Court must "determine whether the group engages in 'expressive association'" or "religious association."  See Dale, 530 U.S. 647 (free-speech association); Salvation Army, 919 F.2d at 198-99 (free-exercise association).  Second, the Court must determine whether forced inclusion of the unwanted person in the group would "significantly affect" the group's ability to engage in protected speech or religious practice.  See Dale, 530 U.S. 650.

Regarding the first step, the Third Circuit has observed:

> In this context, it is important to recognize that religious organizations might engage in two different types of activity that are protected by the First Amendment:  (1) expression of ideas, which is protected by the free speech clause whether the ideas in

> question are religious or not; and (2) exercise of religion, which
> may include actions that are not covered by the free speech clause.
> . . .  [T]he correct freedom of association analysis depends upon
> the nature of the activity for which protection is claimed.

<u>Salvation Army</u>, 919 F.2d at 199.  Thus, the Church can rely on both a free-speech association theory and a free-exercise association theory.

### 1. Association for Religious Purposes

The Third Circuit's decision in <u>Salvation Army v. Department of Community Affairs</u> controls this case.  In <u>Salvation Army</u>, the Third Circuit considered whether New Jersey's Room and Boarding House Act was unconstitutional because it required The Salvation Army to comply with various regulations that conflicted with The Salvation Army's stated Christian purpose. <u>Salvation Army</u>, 919 F.2d at 185.  The Salvation Army was a Christian ministry that operated an Adult Rehabilitation Center.  <u>Id.</u> at 187-88.  Operation of the center was "central to the religious mission of The Salvation Army."  <u>Id.</u> at 188.  The Adult Rehabilitation Center housed and fed up to fifty-two individuals with "social handicaps," most of whom were homeless men.  <u>Id.</u> at 189. The regulations at issue were neutral and generally applicable, but several regulations conflicted with The Salvation Army's rehabilitation program.  For example, the rehabilitation program included "mandatory work therapy," which was designed to help residents develop the skills necessary to maintain stable employment.  <u>Id.</u> at 189.  The Salvation Army did not pay residents a salary for labor performed during "mandatory work therapy."[13]  <u>Id.</u>  The work generally involved performing chores for The Salvation Army thrift store.  <u>Id.</u>  This practice conflicted with New Jersey's Room and Boarding House Act, which prohibited boarding establishments from requiring residents to perform work for the facility "except as contracted for by the resident and the operator."  <u>Id.</u> at 191.

---

[13] The Salvation Army gave residents "a small gratuity" for their work.  <u>Id.</u> at 189.

The Salvation Army brought claims for violation of the Free-Exercise Clause as well as infringement of its right to associate for religious purposes.  Because the regulations at issue were neutral and generally applicable, the Third Circuit denied The Salvation Army's claim that the regulations violated the Free-Exercise Clause.  Id. at 196 (The Salvation Army's "Free Exercise arguments, taken alone, must fail").  Regarding The Salvation Army's freedom-of-association claim based on the Free-Exercise Clause, the Third Circuit reasoned:

> We would not expect a derivative right to receive greater protection than the right from which it was derived.  In the context of the right to exercise of one's religious convictions, we think it would be particularly anomalous if corporate exercise received greater protection than individual exercise – if, for example, the right to congregational prayer received greater protection than the right to private prayer.  Similarly, we would not expect the Supreme Court to treat the use of peyote for religious purposes in groups differently than the right to do so individually.  As we have seen, the primary right of free exercise does not entitle an individual to challenge state actions that are not expressly directed to religion.  Accordingly, the derivative right to religious association could not entitle an organization to challenge state actions, such as those at issue in the present controversy, that are not directly addressed to religious association.

Id. at 199.  Thus, the Third Circuit denied The Salvation Army's freedom-of-association claim based on the Free-Exercise Clause because it found that there was no underlying violation of the Free-Exercise Clause.  See id. ("there is no constitutional right to associate for a purpose that is not protected by the First Amendment").

Salvation Army is indistinguishable from the present case.  Under Salvation Army, the Church qualifies as a religious association that is entitled to protection under the Free-Exercise Clause.  The Church is an association of individuals for the purpose of practicing religion.  And, just at the Adult Rehabilitation Center was a core ministry of The Salvation Army, the CCRC is a core ministry of the Church.  As discussed above, because N.J. Stat. Ann. § 52:27D-345(e) is

neutral and generally applicable, the Church's underlying free-exercise claim, "standing alone, must fail." Id. at 196.  Consequently, the Church's freedom-of-association claim predicated on the Free-Exercise Clause also fails.

### 2.    Association Based on Speech

Although the Third Circuit denied The Salvation Army's freedom-of-association claim based on the Free-Exercise Clause, it separately considered whether the regulations at issue violated The Salvation Army's right to associate based on the Free-Speech Clause. Id. at 200.  In so doing, the Third Circuit observed, "[a]fter Smith, it is apparent that the right to free speech has different contours than the right to free exercise of religion, and, accordingly, the right of expressive association has different contours depending upon the activity in which a group is engaged." Id.  The Third Circuit continued:

> Unlike the derivative right of religious association, the right to associate for free speech purposes does not require that the challenged state action be directly addressed to the constitutionally protected activity.  The Roberts opinion teaches that strict scrutiny is to be applied to infringements on the freedom of association for free speech purposes even when the challenged action is not specifically directed to the exercise of that right.  To invoke this scrutiny, it is sufficient that [Salvation Army] seeks to communicate a message; for this purpose it is not relevant that [Salvation Army]'s message happens to be religious in nature.

Id. at 200 (internal citation omitted).  The Third Circuit found that The Salvation Army was an expressive association entitled to protection under the Free-Speech Clause and that the challenged regulations were subject to strict scrutiny. Id. at 200-01.  The Third Circuit remanded the case to the district court so that the parties could present evidence relevant to whether the regulation was "narrowly tailored to a compelling interest." Id. at 201.

The Roberts opinion cited by the Third Circuit in Salvation Army involved a conflict between a private club that prohibited women from becoming members and a state law that

prohibited general discrimination.  <u>Roberts</u>, 468 U.S. at 612.  The Supreme Court held that a rule

that "interfere[s] with the internal organization or affairs of a group" infringes a group's right to

freely associate for expressive purposes.  <u>Id.</u> at 622.  Indeed, the Court found:

> There can be no clearer example of an intrusion into the internal
> structure or affairs of an association than a regulation that forces
> the group to accept members it does not desire.  Such a regulation
> may impair the ability of the original members to express only
> those views that brought them together.  Freedom of association
> therefore plainly presupposes a freedom not to associate.

<u>Id.</u> at 623.  The Court therefore held that the state law was constitutional only if it served

"compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through

means significantly less restrictive of associational freedoms."  <u>Id.</u>  Applying strict scrutiny, the

Court upheld the state's antidiscrimination law.  <u>Id.</u>

 The Supreme Court has revisited the law regarding associational rights based on the Free-

Exercise Clause since <u>Roberts</u> and <u>Salvation Army</u>.  In <u>Boy Scouts of Am. v. Dale</u>, 530 U.S.

640, 643 (2000), the Boy Scouts revoked the membership of an "adult scout" who was openly

gay.  The scout sued under New Jersey's Law Against Discrimination ("NJLAD"), which

prohibits discrimination based on sexual orientation in places of public accommodation.  <u>Id.</u> at

645.  The Boy Scouts responded that the NJLAD violated its First Amendment right to associate

for expressive purposes.  <u>Id.</u> at 643.

 The Supreme Court held that the First Amendment protected the Boy Scouts' right to

control its membership.  <u>Id.</u>  at 661.  The Supreme Court applied a three-step analysis.  First, it

analyzed whether the Boy Scouts was an "expressive association."  <u>Id.</u> at 648-49.  The Supreme

Court held that the Boy Scouts was an expressive association because its purpose was to "instill

values in young people."  <u>Id.</u> at 649-50.  Next, the Court evaluated "whether the forced inclusion

of [the expelled scout] would significantly affect the Boy Scouts' ability to advocate public or

private viewpoints." Id. at 650.  The Court determined that the Boy Scouts' official position was that homosexuality was immoral and that requiring the Boy Scouts to admit the expelled scout would "interfere with the Boy Scout's choice not to propound a point of view contrary to its beliefs." Id. at 655-56.  Finally, the Court analyzed whether the NJLAD was narrowly tailored to a compelling interest. Id. at 656-57.  Although the court noted that eliminating discrimination can be a compelling state interest, the Court concluded that the "state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scout's freedom of expressive association." Id. at 659.

Applying the principles of Salvation Army, Roberts and Dale, the Court finds that the Church is an expressive association entitled to protection under the Free-Exercise Clause.  "To come within the protection of expressive association, 'a group must engage in some sort of expression, whether it be public or private.'" Schultz v. Wilson, 304 F. App'x. 116, 120 (3d Cir. 2008) (quoting Dale, 530 U.S. at 648).  "The expansive notions of expressive association used in Roberts and Dale demonstrate that there is no requirement that an organization be primarily political (or even primarily expressive) in order to receive constitutional protection for expressive associational activity." See Pi Lambda Phi Fraternity v. University of Pittsburgh, 229 F.3d 435, 443 (3d Cir. 2000).  "An association must merely engage in expressive activity that could be impaired in order to be entitled to protection." Dale, 530 U.S. at 655.  However, "there is a de minimis threshold for expressive activity claims." Pi Lambda Phi Fraternity, 229 F.3d at 434.  "A social group is not protected unless it engages in expressive activity such as taking a stance on an issue of public, political, social, or cultural importance. Schultz, 304 F. App'x at 120 (citing Pi Lambda Phi Fraternity, 229 F.3d at 444); see City of Dallas v. Stanglin, 490 U.S.

19, 104 (1989) (rejecting claim that group of patrons gathered together at a dance hall was engaged in expressive activity).

The Church is an expressive association.  "The goal of [the Church] is to carry out the Great Commission as given by Jesus Christ" and to "reveal[] Christ as the Answer to life." (Gilmore Aff. ¶ 4).  To that end, the Church engages in "worship, evangelization, religious education, and social ministries."  "Evangelization" is, by definition, an expressive activity.  See Webster's Third New International Dictionary 786  (1993) ("evangelize:  to instruct in the gospel.").  Moreover, the CCRC is a "core" expressive activity of the Church.  According to the CCRC's President and CEO, "[t]hrough its ministries, including the Wiley CCRC, . . . Wiley is committed to revealing Christ as the Answer to life, now and forever, to all who seek him." (Gilmore Aff. ¶ 12) (emphasis added).  In other words, the CCRC is not simply a resident care facility.  It is a resident care facility that is inextricably linked to the Church's stated goal of evangelization.  Thus, just as the Third Circuit found that The Salvation Army's Adult Rehabilitation Program was entitled to First Amendment protection because it was fundamental to The Salvation Army's expressive activities, the Court finds that the CCRC is protected by the First Amendment because it is fundamental to the Church's expressive activities.  See Salvation Army, 919 F.2d at 200.

The Department nevertheless argues that the CCRC is not entitled to First Amendment protection because it is primarily a commercial enterprise.  That argument is misguided. Although the CCRC charges residents for its services, the Church is a non-profit, tax-exempt, religious corporation.  The CCRC does not exist to earn a profit.  It exists because it is part of the Church's expressive (and religious) activities.  Indeed, as discussed above, the evidence shows that the Church operates the CCRC as a "Christian Retirement Community" and is heavily

involved in its management, operation, and programming.  Moreover, "associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment."  Dale, 530 U.S. at 655.  The Free Exercise Clause applies simply because the Church engages in expressive activities through the CCRC.

However, that analysis does not end the inquiry.  Even though the Church is an expressive association, strict strutiny applies only if N.J. Stat. Ann. § 52:27D-345(e) significantly interferes with the Church's expressive activities.  See Dale, 530 U.S. at 650.  Dale held that the "forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints."  Id. at 648.  The Supreme Court reasoned that a rule requiring an expressive association to accept unwanted members "may impair the ability of the original members to express only those views that brought them together."[14]  Id. at 648.

Here, N.J. Stat. Ann. § 52:27D-345(e) requires the Church to accept an elected resident as a full voting member of its Board of Trustees.  This significantly interferes with the Church's ability to control the substance of its expressive activities.  The Board of Trustees has significant authority in directing the Church's expressive activities and shaping the Church's public and private communications.  (Gilmore Aff. ¶ 10) ("The Trustees are responsible for guiding the Church according to God's will.").  For this reason, the Church's Bylaws impose strict requirements for board membership that are tailored to the Church's communicative purpose.  N.J. Stat. Ann. § 52:27D-345(e) would directly interfere with the Church's ability to control how the substance of its public and private expressions are developed and effectuated.

---

[14] To be sure, the Supreme Court in Roberts ultimately concluded that, as a factual matter, allowing women to join the association did not interfere with the association's expressive activities.  Roberts, 468 U.S. at 627-28.  However, Dale held that forced admittance of unwanted members can interfere with an association's expressive activities.

The Department nevertheless argues that because the Board can make decisions only by a majority vote, the inclusion of a single resident member will not significantly interfere with the Church's expressive rights.  That argument is misguided for several reasons.  First, it overlooks the possibility that the board may be divided and the resident representative may cast the deciding vote.  Second, it ignores that the Church's expressive association includes the requirement that all Board members be "spiritual leaders" who are committed to making decisions by ascertaining and following God's will.  N.J. Stat. Ann. § 52:27D-345(e) requires that the Church include a resident who may not be committed to the same decision-making processes.  That clearly interferes with the Church's right to associate in a particular way for the purpose of developing and communicating a particular message.  Thus, the Court applies strict scrutiny.

Because the Church has made a prima facie showing that N.J. Stat. Ann. § 52:27D-345(e) significantly interferes with its protected expressive activities, the burden shifts to the Department to prove that N.J. Stat. Ann. § 52:27D-345(e) survives strict scrutiny.  See Salvation Army, 919 F.2d at 201.  "To survive strict scrutiny analysis, a statute must: (1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest.  ACLU v. Mukasey, 534 F.3d 181, 190 (3d Cir. 2008) (applying strict scrutiny to facial challenge to statute that contained a content-based regulation of internet content).  The Court finds that the Department does not satisfy that burden.

The Department asserts that N.J. Stat. Ann. § 52:27D-345(e) is intended to protect the rights of senior citizens.  (Defs.' Br. at 14).  However, even if the Court accepts that that interest is "compelling," the Department offers no evidence that N.J. Stat. Ann. § 52:27D-345(e) is narrowly tailored to achieve that goal or that it is the least restrictive regulatory alternative.  The

Department does not explain, for example, why direct regulation of CCRC operating procedures, staff training, and health standards, is inadequate to protect CCRC residents.  Additionally, the 2007 amendments to the Act require the Board to notify residents of Board meetings and give residents a meaningful opportunity to be heard regarding issues related the CCRC.  The Department does not explain how those requirements, which the Church does not contest, are ineffective at maintaining accountability between the Board and residents; therefore rendering N.J. Stat. Ann. § 52:27D-345(e) duplicative.  Although placing a resident on the Board could conceivably increase the Board's accountability to residents, there is no evidence that N.J. Stat. Ann. § 52:27D-345(e) is necessary or even particularly effective at protecting CCRC residents.[15] Because the Board presents no such evidence, the Court grants summary judgment in favor of the Church regarding its freedom-of-association claim (Count III).[16]

### D.  The Church's Equal Protection Claim (Count IV)

The Church argues that N.J. Stat. Ann. § 52:27D-345(e) violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates against the Church based on religion (Count IV).  That claim fails.

---

[15] Indeed, the Department notes that N.J. Stat. Ann. § 52:27D-345(e) was enacted in large part because of lobbying efforts by the Organization of Resident Associations of New Jersey, which generally seeks to give residents "greater say in the governance and affairs of their facilities."   (Cert. of Peter Desch ¶ 6).  This suggest that the provision was not the result of searching empirical analysis that identified the least restrictive means of protecting senior citizens.

[16] The Church also argues that the "ministerial exception" bars any law that affects the leadership of a religious organization.  The ministerial exception is a judicially created exception to liability under employment discrimination laws.  See EEOC v. Catholic Univ. of Am., 83 F.3d 455, 461-462 (D.C. Cir. 1996); see also McClure v. Salvation Army, 460 F.2d 553, 560-61 (5th Cir. 1972) (first recognizing the exception).  It provides that churches and other religious institutions are not liable for discriminating in employment if the employee is retained to perform a religious function.  See Petruska v. Gannon Univ., 462 F.3d 294, 307 (3d Cir. 2006); McClure, 460 F.2d at 553 ("We therefore hold that Congress did not intend, through the non-specific wording of the applicable provisions of Title VII, to regulate the employment relationship between church and minister.").  The Church argues that the Court should apply the ministerial exception to bar affirmative regulation by the state (rather than as a defense to a civil cause of action in a private dispute).  The Church does not cite any precedent applying the ministerial exception to prohibit the government from enforcing a neutral and generally applicable law against a religious organization.  Because the Court finds that N.J. Stat. Ann. § 52:27D-345(e) unconstitutionally infringes the Church's expressive associational rights, the Court does not decide whether the ministerial exception bars affirmative state regulation.

The Equal Protection Clause protects similarly situated individuals from unequal treatment under the law.  U.S. Const. amend. XIV, § 1; see Kuhar v. Greensburg-Salem School Dist., 616 F.2d 676, 677 (3d Cir. 1980).  In general, if a challenged law distinguishes between individuals based on their ability to exercise a fundamental right or by reference to race, national origin, alienage, illegitimacy, or gender, the court must review the law under a heighted standard of review.  See Willing v. Lake Orion Community Sch. Bd. of Trustees, 924 F. Supp. 815, 820 (E.D. Mich. 1996).  If a law does not involve a distinction implicating a fundamental right or a recognized classification, the law is presumed valid and rational basis review applies.  Id. Significantly, the Equal Protection Clause applies only if the challenged law classifies individual on some basis.  See Amerada Hess Corp. v. Div. of Taxation, 490 U.S. 66, 79 (1989) (denying equal protection claims because there was "no discriminatory classification underlying the" challenged statute.).  A government can classify individuals by enacting a law that contains a classification "on its face" or by applying a neutral law in a selective or discriminatory manner. See John E. Nowak & Ronald D. Rotunda, Constitutional Law 711 (7th ed. 2004).

Here, the Church acknowledges that N.J. Stat. Ann. § 52:27D-345(e) is neutral on its face.  Thus, rational basis review applies unless the Church can show that the Department selectively enforces N.J. Stat. Ann. § 52:27D-345(e) by discriminating against CCRSs based on their religion or speech.

To establish a selective-enforcement claim, the Church must show:  "(1) that he was treated differently from other similarly situated individuals, and (2) 'that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right.'"  Dique v. N.J. State Police, 603 F.3d 181, 184 (3d Cir. 2010) (quoting Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005) (quoting

Holder v. City of Allentown, 987 F.2d 188, 197 (3d Cir. 1993)).  "Hence, to maintain an equal protection claim of this sort, [a plaintiff] must provide evidence of intentional or purposeful discriminatory purpose, not mere unequal treatment or adverse effect."  Jewish Home v. Ctrs. for Medicare & Medicaid Servs., 2011 U.S. App. LEXIS 2681, at *8 (3d Cir. Feb. 11, 2011) (citing Snowden v. Hughes, 321 U.S. 1, 8 (1944)).  A plaintiff must "show that the 'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects . . . .'"  Id. (quoting Wayte v. United States, 470 U.S. 598, 610 (1985) (quotations omitted)).

The Church cannot satisfy that burden.  There is no evidence that the Department applies N.J. Stat. Ann. § 52:27D-345(e) in a selective manner.  There are approximately twenty-seven CCRCs in New Jersey.  (Cert. of Peter Desch ¶ 10).  All CCRCs except the Church have complied with N.J. Stat. Ann. § 52:27D-345(e).  (Id. ¶ 7).  Only the Church objected to N.J. Stat. Ann. § 52:27D-345(e).  (Id. ¶ 11).  Thus, the Department applied N.J. Stat. Ann. § 52:27D-345(e) equally to all twenty-seven CCRCs.  The Church must do more than show that N.J. Stat. Ann. § 52:27D-345(e) adversely affects religious and expressive CCRCs.  It must show that the Department enforced N.J. Stat. Ann. § 52:27D-345(e) at least in part because it would adversely affect religious and expressive CCRCs.  There is no evidence to support that conclusion.  Thus, the Court grants summary judgment denying the Church's Equal Protection claim (Count IV).

### E.  The Church's State Constitutional Claims (Counts II and V)

The Church alleges that N.J. Stat. Ann. § 52:27D-345(e) violates its right to free exercise of religion and equal protection as guaranteed by the New Jersey Constitution (Counts II and V).  The Church does not allege that N.J. Stat. Ann. § 52:27D-345(e) violates its associational rights under the New Jersey Constitution.

### 1.   Free Exercise of Religion

Article I, Paragraph 3 of the New Jersey constitution provides that "[n]o person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience."  N.J. Const. art. I, ¶ 3.  Although that provision contains significant textual and historical variations from the First Amendment, see Robert F. Williams, The New Jersey State Constitution 32 (updated ed. 1997), and although the New Jersey Supreme Court has frequently announced that the New Jersey Constitution can provide more expansive protections than the Federal Constitution, see State v. Novembrino, 519 A.2d 820, 849-50 (N.J. 1987), the New Jersey Supreme Court has consistently equated the meaning of Article I, Paragraph 3 with the Supreme Court's interpretation of the First Amendment.  See, e.g., State v. Cameron, 498 A.2d 1217, 1127-28 (N.J. 1985); see also Williams, The New Jersey State Constitution 32 (noting that the New Jersey Supreme Court tends to "equate" Article I, Paragraph 3 with the First Amendment).

Here, the Church does not separately defend its claim under Article I, Paragraph 3 of the New Jersey Constitution.  The Church cites no authority for the position that Article I, Paragraph 3 provides more expansive protections than the First Amendment.  Thus, the Court finds that the Church's claim under the New Jersey Constitution fails for the same reasons that its First Amendment claim fails.

### 2.   Freedom of Association

Article I, Paragraph 18 provides that the "people have the right freely to assemble together . . . ."  N.J. Const. art. I, ¶ 18.  As with Article I, Paragraph 3, the New Jersey Supreme Court tends to equate Article I, Paragraph 18 with the First Amendment's freedom-of-association

provision.[17]  The Church does not separately defend its freedom of association claim under the

New Jersey Constitution.  Thus, the Court finds that N.J. Stat. Ann. § 52:27D-345(e) violates

Article I, Paragraph 18 of the New Jersey Constitution for the same reasons that it violates the

First Amendment.

### 3.  Equal Protection

"Unlike its federal counterpart, the New Jersey Constitution does not contain an equal

protection clause."  State v. Chun, 943 A.2d 114, 142 (N.J. 2008).  However, the New Jersey

Supreme Court has found that "[a] concept of equal protection is implicit in" the New Jersey

Constitution's Due Process guarantee, N.J. Const. art. I, par. 1.  McKenney v. Byrne, 412 A.2d

1041, 1047 (N.J. 1980).  "Although conceptually similar, the right under the State Constitution

can in some situations be broader than the right conferred by the Equal Protection Clause."  Doe

v. Poritz, 662 A.2d 367, 414 (1995).  Moreover, the New Jersey Supreme Court applies a

different analysis to equal protection claims under the New Jersey Constitution:

> In considering equal protection-based challenges, we have not
> followed the traditional equal protection paradigm of the federal
> courts, which focuses rigidly on the status of a particular protected
> class or the fundamental nature of the implicated right.  Instead,
> when analyzing equal protection challenges under New Jersey's
> Constitution, we have applied a balancing test that weighs the
> nature of the affected right, the extent to which the governmental
> restriction intrudes upon it, and the public need for the restriction.

Chun, 943 A.2d at 142 (quotation marks and citations omitted).

Applying that standard, the Court finds that the Church fails to state an equal protection

violation under the New Jersey Constitution.  Although the New Jersey Constitution can provide

greater protection than the Federal Constitution, there is no evidence in this case that New

---

[17] The New Jersey has interpreted the underlying right to free speech more broadly than the First Amendment's Free Speech Clause, but that precedent is not relevant here.  See State v. Schmid, 423 A.2d 615 (N.J. 1980) (holding that private university is subject to free speech guarantees of New Jersey Constitution).

Jersey's adoption or enforcement of N.J. Stat. Ann. § 52:27D-345(e) is based on any impermissible classifications or the intent to infringe upon the Church's fundamental rights.  To be sure, as discussed above, N.J. Stat. Ann. § 52:27D-345(e) infringes the Church's freedom of association based on free speech.  However, there is no indication that the Department enforces N.J. Stat. Ann. § 52:27D-345(e) for the purpose of treating religious or expressive associations different than other associations.  There is simply no indication that the Department applies N.J. Stat. Ann. § 52:27D-345(e) in a discriminatory manner.  Equal protection concepts therefore do not apply.

### F.  The Church's Request for a Permanent Injunction

Plaintiff requests that the Court permanently enjoin the Department from enforcing N.J. Stat. Ann. § 52:27D-345(e) against it.  A plaintiff requesting a permanent injunction must show: (1) an irreparable injury; (2) the inadequacy of legal remedies; (3) that an equitable remedy is warranted given the balance of hardships between the parties; and (4) that the public interest would not be disserved by the injunction.  eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 390 (2006); see Gucci v. Am., Inc. v. Daffy's Inc., 354 F.3d 228, 236-37 (3d Cir. 2003); MAG Realty, LLC v. City of Gloucester City, No. 10-988, 2010 U.S. Dist. LEXIS 82035, at *57-59 (D.N.J. Aug. 12, 2010).  Loss of free speech rights constitutes irreparable injury.  See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.").

Here, the Church has shown that it stands to suffer an irreparable injury that could not be redressed at law.  If the Department enforces N.J. Stat. Ann. § 52:27D-345(e), the Church will either lose its license to operate the CCRC, which is central to the Church's expressive association, or have to include a non-Church member on the Church's governing body, which

would infringe the Church's associational rights.  Thus, the Church would suffer an irreparable

injury if the Department enforces N.J. Stat. Ann. § 52:27D-345(e).  Moreover, a monetary

reward would not compensate the Church for the unconstitutional infringement of its First

Amendment Rights.  See MAG Realty, LLC, 2010 U.S. Dist. LEXIS 82035, at *58 ("Although a

monetary award is typically sufficient to redress the injury incident to a loss of business

operations, a monetary award would not compensate Plaintiffs for the unconstitutional muzzling

and consequent loss of expressive outlet contemplated by [the defendant.]").

The Church has also shown that private and public equities support granting a permanent

injunction.  First, requiring the Department to abide by the Constitution serves the public

interest.  See id. at *59.  Second, the CCRC no doubt provides a valuable public service in that it

cares for the elderly and infirm.  The Department presents no evidence that the CCRC provides

inadequate care for its residents or that its facilities, staff, or policies pose a danger to any of its

residents.  Indeed, the evidence suggests that the CCRC provides quality care for its residents.

Thus, there is no overriding public interest in enforcing N.J. Stat. Ann. § 52:27D-345(e) against

the Church because the Church appears to comply with the statute's underlying purpose – to

provide safe and quality care for CCRC residents.  Because N.J. Stat. Ann. § 52:27D-345(e) is

unconstitutional as applied to the Church, and because enforcing N.J. Stat. Ann. § 52:27D-345(e)

is not necessary to protect CCRC residents, the public interests weigh in favor of enjoining the

Department from enforcing N.J. Stat. Ann. § 52:27D-345(e).  Third, regarding the private

interests, an injunction obviously protects the Church and its members' rights to be free from

unconstitutional regulation.  Thus, the Court will enjoin the Department from enforcing N.J. Stat.

Ann. § 52:27D-345(e) against the Church.

**IV.     CONCLUSION**

For the reasons discussed above, the Court grants the Church summary judgment regarding its freedom-of-association claims under the First Amendment (Count III). Consequently, the Court enjoins the Department from enforcing N.J. Stat. Ann. § 52:27D-345(e) against the Church.  The Court grants summary judgment for the Department regarding the Church's remaining claims (Counts I, II, IV and V).  An Order shall issue contemporaneously with the filing of this opinion.


Dated:  August 25, 2011                                   /s/ Robert B. Kugler
                                                              ROBERT B. KUGLER
                                                              United States District Judge